| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL ESPECIAL | | |
| MARÍA EUGENIA RODRÍGUEZ CAMPA<br><br>Recurrente<br><br>V.<br><br>JUNTA DE DIRECTORES Y CONSEJO DE TITULARES COND. CONDADO DEL MAR<br><br>Recurridos | KLRA202500216 | Revisión procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.: C-SAN-2023-0014129<br><br>Sobre: Condominios, Ley Núm. 129-2020, según enmendada |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Sánchez Báez.

Marrero Guerrero, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 13 de junio de 2025.

Comparece la señora María Eugenia Rodríguez Campa (señora Rodríguez Campa o recurrente) y nos solicita revisar una *Resolución Sumaria* emitida y notificada el 21 de agosto de 2024 por el Departamento de Asuntos del Consumidor de Puerto Rico (DACo).[1] Mediante el referido dictamen, el DACo declaró No Ha Lugar a la *Querella* que la recurrente presentó contra la Junta de Directores y el Consejo de Titulares del Condominio Condado del Mar (en conjunto, recurridos). El Foro recurrido avaló la asignación de hasta $30,000.00 del fondo de reserva del Condominio para estudiar y diseñar un generador que proveyera electricidad a las áreas comunes y privadas, más una derrama de $1,772,767.00 para realizar varias obras, sin contar con la votación unánime de los titulares.

Por los fundamentos que expondremos a continuación, se adelanta la confirmación de la determinación recurrida, únicamente

---

[1] Apéndice de *Revisión Judicial*, Anejo 4, págs. 176-184. El 22 de agosto de 2024, el DACo emitió una *Resolución Nunc Pro Tunc* para corregir su *Resolución Sumaria* a los fines de declarar No Ha Lugar a la *Querella* presentada por la recurrente. Dicha determinación se reiteró mediante una *Resolución* emitida el 14 de marzo de 2025.

Número Identificador
SEN2025_____

a los efectos de la asignación de una partida del fondo de reserva para el estudio del generador eléctrico de mayor capacidad en el Condominio Condado del Mar.

## I.

Este caso se originó el 27 de marzo de 2023 cuando la señora Rodríguez Campa presentó una *Querella* contra los recurridos.[2] En esta, cuestionó la aprobación de una derrama de $1,772,767.00 por doce (12) meses para realizar una inspección ocular; elaborar planos estructurales preliminares para reforzar los parapetos; implementar medidas temporeras para evitar la caída de cemento, y pintar diversas estructuras. Alegó que los titulares carecían de la información necesaria sobre las obras objeto de la derrama, así como de las personas responsables de su ejecución.

De otra parte, la recurrente disputó la asignación de hasta $30,000.00 del fondo de reserva para estudiar y diseñar un generador eléctrico para las áreas comunes y privadas del Condominio Condado del Mar. Puntualizó que tal artefacto no constituía una obra necesaria, sino que aumentaría el valor de la propiedad. Por ello, concibió que los referidos gastos de estudio requerían una votación unánime, puesto que el dinero y los recursos no se podían dilapidar.

Por lo anterior, solicitó que el DACo ordenara la entrega de documentos relacionados con las obras, más declarara nula la derrama y la utilización del fondo de reserva que se aprobaron. Asimismo, peticionó declarar que el generador eléctrico era una obra de mejora y que su estudio previo requería un voto unánime.

Subsiguientemente, el 11 de julio de 2023, los recurridos presentaron una *Contestación a Querella*.[3] En esta, adujeron que la Asamblea Extraordinaria se celebró de acuerdo con los requisitos de ley. De igual forma, sostuvieron que las obras clasificadas como

---

[2] *Íd.*, Anejo 2, págs. 12-27.
[3] *Íd.*, Anejo 3, págs. 173-175.

necesarias y la derrama para sufragar dichos gastos se aprobaron válidamente, puesto que contaron con la mayoría de los votos de los titulares presentes en la Asamblea o sus representantes. Enfatizaron que la adquisición de un generador eléctrico era una obra necesaria que se debía aprobar con el voto mayoritario de los titulares presentes o representados en la Asamblea Extraordinaria, a tenor con los Artículos 17 y 18 de la *Ley de Condominios de Puerto Rico*, Ley Núm. 129-2020, según enmendada, 31 LPRA secs. 1921p y 1921q.

Posteriormente, el 21 de agosto de 2024, el DACo emitió una *Resolución Sumaria* que enmendó al próximo día a través de una *Resolución Nunc Pro Tunc* para declarar No Ha Lugar a la *Querella*.[4] En esta, resolvió que no podía concluir que la derrama se aprobó sin informar las obras propuestas a los titulares. Además, determinó que la recurrente se equivocó al alegar que se requería una votación unánime para aprobar el estudio y diseño de un sistema eléctrico que supliera electricidad a las áreas privadas y comunes del Condominio. Indicó que, al contrario, la votación unánime se requería en asuntos de mayor trascendencia o que afectaran los intereses fundamentales de un titular. Por último, consignó que se abstuvo de resolver si la adquisición del generador eléctrico constituía una obra de mejora o necesaria, ya que estaría emitiendo una opinión consultiva al no ser un asunto de la Asamblea Extraordinaria.

Inconforme, el 10 de septiembre de 2024, la señora Rodríguez Campa presentó una *Solicitud de Reconsideración y Solicitud de Consolidación*.[5] La recurrente arguyó que el DACo no abordó la controversia de hecho esencial respecto a si la Junta de Directores proporcionó un mínimo de información para los titulares evaluar adecuadamente la derrama millonaria. Subrayó que su objeción no versó sobre las obras en sí, sino el proceso de su aprobación sin

---

[4] *Íd.*, Anejo 4, págs. 176-184; Anejo 5, págs. 185-186.
[5] Anejo 5, págs. 187-198.

contar con información suficiente. Precisó que el DACo no evaluó la transcripción de la Asamblea Extraordinaria, en la que surgió que la Junta de Directores aclaró solamente la partida de $400,000.00 para el arreglo de los parapetos, sin revelar el destino de los restantes $1,300,000.00 de la derrama. Además, señaló que la agencia no estaría emitiendo una opinión consultiva al resolver si el generador eléctrico constituía una obra de mejora o necesaria, ya que el 13 de abril de 2024 presentó otra *Querella* para impugnar la posterior aprobación de su adquisición. Por ello, solicitó una vista de reconsideración para resolver las controversias de hechos medulares.

El 14 de marzo de 2025, el DACo emitió una *Resolución* en la que reiteró su determinación de declarar No Ha Lugar a la *Querella*, tras celebrar una vista administrativa el 27 de noviembre de 2024.[6] En esta, formuló las siguientes determinaciones de hechos:

1. La querellante es titular del apartamento B-4 del Condominio Condado del Mar mediante la Escritura de Compraventa Número Siete (7) otorgada el 21 de junio de 2006 ante la Notario Rosemarie Braegger Semanaz.
2. El Condominio Condado del Mar ubicado en el Municipio de San Juan, está sometido al Régimen de Propiedad Horizontal y consta de 403 apartamentos.
3. El 25 de febrero de 2023 se celebró una Asamblea Extraordinaria en la que se aprobó una serie de asuntos incluyendo una derrama por la cantidad de $1,772,767.00 dólares y la utilización de hasta $30,000.00 dólares del fondo de reserva para costear un estudio y diseño de un sistema eléctrico.
4. La Convocatoria para dicha Asamblea Extraordinaria fue circulada mediante correo electrónico, el 16 de febrero de 2023. A dicha comunicación le fue anejada los siguientes documentos:
   1) Propuesta de Reparación [de] estructura temporera y pintura de *Manor Contractors*.
   2) Propuesta de planos estructurales para refuerzo de los parapetos del [i]ngeniero García[.]
   3) Propuesta de inspección ocular de los parapetos de la torre por el [i]ngeniero García.
   4) Listado de distribución de derrama por apartamento.
   5) Informe de evaluación del sistema de parapetos y recomendaciones.
   6) Propuesta de confección de planos arquitectónicos preliminares por el [a]rquitecto Ángel Núñez.
   7) Propuesta de preparación de planos estructurales preliminares por el Ingeniero García.

---

[6] Anejo 1, págs. 1-11.

5. La parte querellante estuvo presente en dicha Asamblea y participó y votó en la misma.

6. En dicha Asamblea se atendieron varios asuntos entre los cuales estaban incluidos los siguientes:

   **Asunto #4 Agenda:** Aprobación por el Consejo de Titulares de la imposición de una derrama para llevar a cabo lo siguiente: a) Inspección ocular de los apartamentos de la torre para determinar el arreglo temporero y pertinente por apartamento; b) Servicios de diseño y preparación de planos estructurales preliminares para reforzar los parapetos existentes que lo necesiten según inspección ocular; c) reparación estructural temporera de torre para detener la caída de proyectiles de cemento en lo que se reemplazan los parapetos; d) materiales y mano de obra para pintar la torre y las cabañas incluyendo verja perimetral y estacionamiento. La derrama que se propone es de $1,772,767.00 dólares por un término de doce (12) meses y el trabajo lo estaría haciendo el Contratista *Manor Contractors* y el [ingeniero] García.

   **Asunto #8 Agenda:** Aprobación por el Consejo de Titulares de la utilización de fondos de reserva para un presupuesto de hasta $30,000.00 dólares para ser utilizado en un estudio y diseño de un sistema eléctrico, incluyendo costos, equipos, y permisos, para poder obtener un costo de real de añadir un futuro generador para el edificio y las cabañas que electrifiquen las áreas privadas y comunes.

7. Surge del Acta y transcripción de la Asamblea Extraordinaria la derrama por la cantidad de $1,772,767.00 dólares dispuesta en el Asunto #4 de la Asamblea Extraordinaria, fue aprobada por voto mayoritario.

8. Dicha derrama debía ser pagada en el término de doce (12) meses. A la parte querellante le corresponde pagar $302.85 dólares mensuales para un total de $3,634.17 dólares.

9. Surge del Acta y [de la] transcripción de la Asamblea Extraordinaria [que] el Asunto #8 dispuesto en Agenda sobre la utilización de fondos de reserva para un presupuesto de hasta $30,000.00 dólares para realizar el estudio y diseño de un sistema eléctrico, fue aprobado por mayoría de votos.

10. Según surge de la transcripción de la Asamblea, el Presidente de la Junta de Directores explicó en qué consistía, el costo y [qué] trabajos incluía la derrama. Surge[,] además[,] que la compañía *Manor Contractors*[,] a través del [ingeniero] Richard Roberts estuvo presente en la Asamblea y explicó en qué consistía el trabajo que estarían realiza[n]do.

11. Surge de la Transcripción de la Asamblea Extraordinaria [que] se realizó una sesión de preguntas y respuestas para aclarar las dudas con respecto a [qué] obras se estarían realizando con la derrama que se solicitaba.

12. De las propuestas presentadas por *Manor Contractors* y el [i]ngeniero García, y remitidas a los titulares nueve (9) días antes de la Asamblea Extraordinaria surge detalladamente los trabajos que estarían realizando y el costo de los mismo[s].

13. Inconforme con los acuerdos aprobados en dicha asamblea, el 27 de marzo de 2023[,] la parte querellante impugnó ante este Foro la aprobación por el Consejo de Titulares de la derrama aprobada por la cantidad de $1,772,767.00 dólares para obras extraordinarias y la aprobación de la utilización de una partida de $30,000.00

dólares del fondo de reserva para un estudio y diseño de un sistema eléctrico.

14. La parte querellante planteó los siguientes asuntos ante este Departamento:

    a. ¿Es posible que el Consejo de Titulares pueda considerar o aprobar una derrama sin tener especificación alguna de la obra que se quiere lograr?

    b. ¿Es considerada la adquisición de un generador eléctrico que aumenta su capacidad y expande su uso, una obra necesaria o una obra de mejora?

    c. ¿Es posible que se aprueben gastos para estudios o diseños previos y directamente relacionados a una obra de mejora que requiere unanimidad en su aprobación, mediante una votación por mayoría simple?

El DACo estableció que los titulares recibieron las propuestas en las que se detallaron las obras objeto de la derrama y sus costos por correo electrónico, previo a celebrarse la Asamblea Extraordinaria. Además, manifestó que tuvieron la oportunidad de realizar preguntas durante la Asamblea Extraordinaria, por lo que la derrama se aprobó mediante el voto mayoritario.

En cuanto a la asignación de una partida del fondo de reserva para estudiar y diseñar un sistema eléctrico de mayor capacidad, el Foro recurrido sostuvo la validez del voto mayoritario. Afirmó que el Consejo de Titulares tenía la facultad de aprobar la adquisición e instalación de un generador eléctrico para las áreas comunes y privadas por voto mayoritario al ser una obra necesaria, de acuerdo con el Artículo 17 de la *Ley de Condominios*, *supra*, sec. 1921p.

En desacuerdo con la determinación, el 14 de abril de 2025, la señora Rodríguez Campa presentó una *Revisión Judicial* en la que esbozó que el DACo cometió el siguiente error:

ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR AL ADOPTAR UNA INTERPRETACIÓN LITERALISTA DEL ARTÍCULO 17 DE LA LEY NÚM. 129-2020 Y CONCLUIR QUE LA TRANSFORMACIÓN FUNCIONAL DE UN GENERADOR -PARA ENERGIZAR POR PRIMERA VEZ UNIDADES PRIVATIVAS-, ASÍ COMO LOS ESTUDIOS DE DISEÑO DIRIGIDOS A DICHA AMPLIACIÓN DE CAPACIDAD Y USO, CONSTITUYEN UNA OBRA NECESARIA, SIN CONSIDERAR EL CONTEXTO NORMATIVO, EL HISTORIAL LEGISLATIVO, LA DOCTRINA ESPECIALIZADA NI LA JURISPRUDENCIA APLICABLE.

La recurrente planteó que la interpretación literal que el DACo le otorgó al Artículo 17 de la *Ley de Condominios, supra,* sec. 1921p, validó una votación por mayoría simple para una obra de mejora sujeta a unanimidad. Pues, enfatizó que el generador existente suplía electricidad adecuadamente para las áreas comunes. Por ello, adujo que extender un generador eléctrico a las áreas privativas transformó la naturaleza y el alcance del beneficio común, más no respondía a la necesidad estructural, obligación legal o carga económica prevista al momento de adquirir su inmueble. Subrayó que los titulares que optaron por no utilizar el servicio en sus apartamentos estarían obligados a sufragar la instalación y el mantenimiento de una obra en beneficio de otros titulares, lo que resultaría en un enriquecimiento injusto. Además, precisó que dicha obra beneficiaría privativamente a una parte significativa de titulares dedicados al alquiler a corto plazo, ya que aumentaría el atractivo comercial de ofrecer la continuidad del servicio eléctrico. Ante ello, reiteró que el generador eléctrico era una obra de mejora que aumentaría el disfrute privado, no la conservación de los elementos comunes.

El 30 de abril de 2025, la señora Rodríguez Campa solicitó una orden en auxilio de jurisdicción para que las partes se abstuvieran de realizar cualquier acción que hiciera inefectiva la decisión final de este Tribunal. Ello, en vista de que el 24 de abril de 2025 se celebró una Asamblea Extraordinaria en la que se aprobó cambiar el destino y uso de cuatro (4) estacionamientos comunales para instalar el nuevo generador eléctrico objeto de esta controversia.

Ante ello, el 5 de mayo de 2025, emitimos una *Resolución* en la que ordenamos que las partes se abstuvieran de efectuar cualquier gestión relacionada con la adquisición del nuevo generador eléctrico o cambiar el destino o uso de los estacionamientos comunales.

Por su parte, el 14 de mayo de 2025, los recurridos presentaron su *Alegato.* En esta, sostuvieron que la Asamblea Legislativa

flexibilizó la *Ley de Condominios, supra,* para catalogar la adquisición de un generador eléctrico para las áreas comunes y privadas como una obra necesaria. Por ello, expresaron que el Consejo de Titulares tenía autoridad para aprobar la adquisición del generador en cuestión mediante el voto mayoritario. Por lo anterior, nos solicitaron confirmar la determinación recurrida por gozar de corrección.

## II.

### A. Revisión judicial

La revisión judicial permite que este Tribunal revise las decisiones, órdenes y resoluciones finales de un foro administrativo. Art. 4.006(c) de la *Ley de la Judicatura,* Ley Núm. 201-2003, según enmendada, 4 LPRA sec. 24y; Sec. 4.2 de la *Ley de Procedimiento Administrativo Uniforme,* Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9672 (LPAUG). Su objetivo es asegurar que el foro administrativo actúe dentro del poder delegado y la política legislativa. *OEG v. Martínez Giraud,* 210 DPR 79, 88 (2022); D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme,* 3ra ed., Bogotá, Forum, 2013, pág. 669.

Los tribunales sostendremos las determinaciones de hechos de la agencia si se basan en la evidencia sustancial del expediente administrativo. Sec. 4.5 de la LPAUG, *supra,* sec. 9675. No obstante, revisaremos las conclusiones de derecho en todos sus aspectos. *Íd.*; *Vázquez y otro v. Con. Tit. Los Corales,* 2025 TSPR 56. En el pasado, nuestra revisión judicial se circunscribía a otorgar deferencia a la interpretación administrativa basado en su conocimiento especializado y determinar si la misma fue razonable. *Íd.*

Sin embargo, el Tribunal Supremo de Puerto Rico adoptó la interpretación federal en cuanto a que los tribunales debemos ejercer un juicio independiente al determinar si un foro administrativo actuó dentro del marco de sus facultades estatutarias. *Íd.*, véase, *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024). Ello, sin tener

que otorgar deferencia a la interpretación que la agencia le otorgó al derecho, sino guiados por los mecanismos interpretativos judiciales. *Íd.* Pues, a diferencia de las agencias, los tribunales tenemos mayor oportunidad de "[s]ituar estas controversias en un ámbito más amplio, donde la consideración decisiva tiene que ser el continuado mantenimiento de un vigoroso régimen de derecho en la comunidad, abonado por la indispensable fe pública en los procesos administrativos y judiciales". *Íd., citando a South Porto Rico Sugar Co. v. Junta Azucarera*, 82 DPR 847 (1961).

Por otro lado, las cuestiones mixtas de hechos y de derecho se considerarán como controversias de derecho, por lo que serán revisables en toda su extensión. *Super. Asphalt v. AFI y otro*, 206 DPR 803 (2021); *Rivera v. A&C Development Corp.*, 144 DPR 450 (1997).

### B. Generadores eléctricos

A tenor con el Artículo 17 (a) (7) de la *Ley de Condominios*, *supra*, sec. 1921p, un generador de energía eléctrica que supla la demanda de áreas comunes, o comunes y privadas, haciendo uso de la infraestructura eléctrica del condominio, se considera como un elemento común general necesario. Véase también M. J. Godreau & Mariana I. Hernández Gutiérrez, *El Condominio: El Régimen de Propiedad Horizontal en Puerto Rico*, 3ra. ed., San Juan, Ediciones SITUM, 2023, pág. 244; M. E. García Cárdenas, *Propiedad Horizontal: Ley de Condominios 2020,* San Juan, BiblioGráficas, 2023, págs. 22-24, 32. Sobre el particular, los profesores Godreau y Hernández expresaron lo siguiente:

> […] La Ley [de Condominios] vigente claramente cataloga en el inciso (a) (7) del Art. 17 los generadores "de energía eléctrica que suplan la demanda de áreas comunes, o comunes y privadas", como un elemento común necesario. […]
>
> Ciertamente, la clasificación de las obras como urgentes, de conservación o extraordinarias, cuyos requisitos para su adquisición o reparación varían, dependerá en muchas ocasiones de las características particulares de cada condominio. En el caso de los ascensores, por ejemplo, el Art. 17, al incluirlos dentro de los elementos comunes necesarios, excluye de esta categoría a los que no "sean necesarios para

el adecuado disfrute de los apartamentos". En estos casos, la restitución del servicio del ascensor no podrá catalogarse como una obra urgente si su avería no afecta el disfrute de los apartamientos. Godreau & Hernández Gutiérrez, *op cit.*, págs. 244-245.

Los elementos comunes generales necesarios se caracterizan por su función esencial de garantizar la existencia, seguridad, conservación y el adecuado uso y disfrute de los apartamentos. *Cestero Aguilar v. Jta. Dir. Condominio*, 184 DPR 1 (2011); *Consejo Titulares v. Ramos Vázquez, supra*; *Junta Dir. Cond. Montebello v. Torres*, 138 DPR 150 (1995). Por ello, gozan de carácter indispensable. *Íd.*; *Trigo Margarida v. Junta Directores*, 187 DPR 384 (2012); *Consejo Titulares v. Ramos Vázquez*, 186 DPR 311 (2012). Tal carácter no puede ser otorgado ni privado por la voluntad de los titulares, ya que es impuesto por mandato de ley. *Arce v. Caribbean Home Construction*, 108 DPR 225, 237 (1978), *citando a* J. Bugeda Lanzas, *La Propiedad Horizontal*, (1954).

Estos elementos comunes generales necesarios no son susceptibles de propiedad individual y están sujetos a un régimen de indivisión forzosa. Art. 17 (a) (7) de la *Ley de Condominios, supra*, sec. 1921p. Su utilización debe de ser para el beneficio de toda la comunidad y no puede tener el efecto de variar su naturaleza común, ya que, todo pacto contrario se considerará nulo. *Soc. de Gananciales v. Suárez Janer*, 122 DPR 46, 54 (1988).

De otra parte, el Artículo 17 (a) (7) de la *Ley de Condominios, supra*, sec. 1921p, establece que "[l]a instalación o [el] cambio de un generador de energía eléctrica que supla la demanda de áreas comunes, o comunes y privadas, haciendo uso de infraestructura eléctrica del condominio será considerada como una obra necesaria". Sobre el particular, el Artículo 18 de la *Ley de Condominios, supra*, sec. 1921q, dispone que "[l]as obras necesarias para la conservación o seguridad del inmueble y para el uso eficaz de los elementos comunes serán acordadas por la mayoría de los titulares". No

obstante, esta aprobación será limitada a que su instalación no menoscabe el disfrute de otro apartamento, en cuyo caso se requerirá el consentimiento del titular afectado. M. Izquierdo Encarnación & M. R. Jiménez Brea, *Introducción a la Propiedad Horizontal*, San Juan, Ediciones SITUM, 2020, pág. 34; véase, además, Art. 44 de la *Ley de Condominios*, *supra*, sec. 1922p.

## C. Fondo de reserva

Por otro lado, el Artículo 49 (d) de la *Ley de Condominios*, *supra*, 1922u, dispone que el presupuesto anual incluirá una partida de fondo de reserva que no será menor del cinco por ciento (5%) del presupuesto total de los gastos del Condominio para cada año. Dicho fondo se irá nutriendo hasta alcanzar el dos por ciento (2%) del valor de reconstrucción. *Íd.* El dinero recaudado se conservará en una cuenta especial, separada de la cuenta de operaciones. *Íd.*

La utilización del fondo de reserva para la realización de obras extraordinarias, urgentes, de mejoras o para atender estado de emergencia será de la siguiente manera:

> 1. *Obras Extraordinarias.* — El Director, el Presidente y/o el Tesorero podrán realizar retiros del fondo de reserva para costear este tipo de obra, previa autorización mayoritaria del Consejo de Titulares debidamente convocado en asamblea extraordinaria.
>
> 2. *Obras Urgentes.* — El Director, Presidente y/o el Tesorero podrán realizar retiros del fondo de reserva para toda obra urgente no prevista en el presupuesto anual, previa autorización mayoritaria del Consejo de Titulares debidamente convocado en asamblea extraordinaria para atender este asunto específico. [...]
>
> 3. *Obras de Mejoras.* — Las obras de mejora sólo podrán realizarse, mediante la aprobación de dos terceras partes (2/3) de los titulares que a su vez reúnan las dos terceras partes (2/3) de las participaciones en las áreas comunes. Se requerirá el consentimiento unánime del Consejo de Titulares cuando dichas obras de mejoras requieran derrama. [...]
>
> 4. *Obras para Atender Estado de Emergencia.* — El Director, el Presidente y/o el Tesorero podrán realizar retiros del fondo de reserva para todo gasto operacional para atender un "Estado de Emergencia", previa autorización mayoritaria del Consejo de Titulares debidamente convocado en asamblea extraordinaria para atender este asunto específico. [...] *Íd.*

**III.**

En el presente caso, la señora Rodríguez Campa circunscribió su planteamiento de error a aducir que el DACo se equivocó al interpretar el Artículo 17 de la *Ley de Condominios, supra,* sec. 1921p, y concluir que el estudio y diseño de un generador eléctrico que amplificara el servicio a las áreas privativas era una obra necesaria. Según la recurrente, el generador existente en el Condominio suplía electricidad adecuadamente en las áreas comunes, por lo que la transformación del alcance de beneficio común no respondía al compromiso financiero o legal que acordó asumir al adquirir su apartamento. Más aún, enfatizó que estaría obligada a sufragar la instalación y el mantenimiento de una obra que aumentaría el disfrute privado de otros titulares.

Tras una lectura integral de la *Ley de Condominios, supra,* y de los hechos del caso de epígrafe, confirmamos la determinación del DACo en sostener la validez del voto mayoritario respecto a la asignación de una partida del fondo de reserva para estudiar y diseñar un sistema eléctrico de mayor capacidad. Dicha etapa de estudio le permitirá al Consejo de Titulares evaluar la viabilidad del generador eléctrico de acuerdo con las necesidades particulares del Condominio y si constituye un gasto necesario por ser indispensable para la conservación, seguridad o el adecuado disfrute de los apartamentos, previo a tomar la determinación final sobre su adquisición. El proceso de evaluación es un paso prudente que permite que el Consejo de Titulares tome una decisión informada en base al potencial impacto que tendría la adquisición del generador eléctrico.

Por otro lado, la *Ley de Condominios, supra,* en nada dispone que se requiere el voto mayoritario para la asignación de una partida del fondo de reserva para los fines propuestos en el Condominio Condado del Mar. Lo único que el Artículo 49 (d) de la *Ley de*

*Condominios, supra,* 1922u, dispone que requerirá el consentimiento unánime del Consejo de Titulares es cuando una obra de mejora requerirá una derrama. Sin embargo, resulta importante destacar que ante este Tribunal no se presentó prueba sobre que para el aludido ejercicio de estudio y diseño de un sistema eléctrico de mayor capacidad en el Condominio Condado del Mar se requería una derrama.

En tal sentido, este Tribunal no adelantará criterios en torno a si la adquisición del generador eléctrico en cuestión constituye una obra necesaria o de mejora, ni sobre el cambio de uso de los estacionamientos. Pues la clasificación de una obra como necesaria dependerá de las características particulares del Condominio, en base a si es necesaria para el adecuado disfrute de los apartamentos. Véase Godreau & Hernández Gutiérrez, *op cit.*, pág. 245. Tampoco adelantaremos criterios sobre los requisitos legales para la variación del uso de varios de los estacionamientos del Condominio por resultar dicha posibilidad un asunto prematuro.

Por todo lo anterior, se confirma la determinación del DACo, limitado a sostener la asignación de una partida del fondo de reserva para el estudio del generador eléctrico de mayor capacidad en el Condominio Condado del Mar.

**IV.**

Por las razones que anteceden, se confirma parcialmente la determinación recurrida.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones